UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

   - against -

YASSAR J. LINARES,
MIGUEL A. ALBERIO,
MARIO CORRALES, and
OSCAR GARRIDO,

                   Defendants.

------------------------------------X

10 Cr. 996-02 (RWS)

SENTENCING OPINION



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5 3 11

**Sweet, D.J.**

      On March 7, 2011, Miguel Alberio, a/k/a "Erwin DeJesus," a/k/a "Miguel Alberto" ("Alberio" or "Defendant") pleaded guilty to one count of conspiracy to commit an armed robbery of a person suspected of possessing narcotics, in violation of 18 U.S.C. § 1951, and one count of using and carrying a firearm during and in relation to a robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(i). For the reasons set forth below, Alberio will be sentenced to 80 months' imprisonment to be followed by 3 years' supervised release. Alberio will also be required to pay a special assessment of $200 and to forfeit all property constituting or derived from

any proceeds he obtained from the instant offenses.

## Prior Proceedings

On October 21, 2010, Indictment 09 CR 996 (RWS) was filed in the Southern District of New York. Count One charges that from June 2010 to September 23, 2010, in the Southern District of New York and elsewhere, Alberio, Yassar J. Linares ("Linares"), Mario Corrales ("Corrales"), Oscar Garrido a/k/a "Oscar Garcia" ("Garrido"), and others conspired to commit an armed robbery of a person suspected of possessing narcotics in an apartment in Bronx, New York, in violation of 18 U.S.C. § 1951. Count Two charges that on September 23, 2010, in the Southern District of New York, the defendants, during and in the course of the robbery conspiracy, used, carried, possessed, and aided and abetted the use, carrying, and possession of firearms, 18 U.S.C. § 924(c)(1)(A)(i). Count Three charges that from least June 2010 to September 23, 2010, in the Southern District of New York and elsewhere, the defendants and others conspired to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 846.

2

On March 7, 2011, Alberio appeared before the Honorable Kevin N. Fox in the Southern District of New York and allocated to Counts One and Two only. In accordance with a plea agreement, the parties stipulated to the following:

Count 1

- Pursuant to § 2B3.1(a), the base offense level is 20;

- Pursuant to § 2B3.1(b)(6), a one-level increase is warranted because the object of the robbery was to take a controlled substance;

- Pursuant to § 3E1.1(a) and (b), a three-level decrease is warranted because the defendant accepts responsibility for his actions, and he pleaded guilty in a timely manner, thereby permitting the government to avoid preparing for trial;

- In accordance with the above, the applicable offense level is 18.

Count 2

- Pursuant to § 2K2.4(b), the guidelines sentence for Count 2 is 60 months' imprisonment, to run consecutively to any sentence resulting from Count 1;

- Based on the information now available, the defendant has three criminal history points which yields to Criminal History Category II;

- Based upon an adjusted offense level of 18 and a Criminal History Category of II, the sentencing guidelines range on Count 1 is 30 to 37 months' imprisonment.  The range is increased by a mandatory consecutive sentence of 60 months' imprisonment on Count 2.  Accordingly, the guidelines range is 90 to 97 months' imprisonment.  In addition, the fine range is $6,000 to $60,000;

- The parties agree that neither a downward nor an upward departure from the stipulated guidelines range is warranted.  The parties agree that either party may seek a sentence outside of the stipulated guidelines range, suggest that the Probation Office consider a sentence outside of the stipulated guidelines range, and suggest that the Court sua sponte consider a sentence outside of the stipulated range, based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a).

Alberio's sentencing is currently scheduled for May

4

31, 2011.

## The Sentencing Framework

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines.  Thus, the sentence to be imposed here is the result of a consideration of:

  (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

  (2)   the need for the sentence imposed —

    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)   to afford adequate deterrence to criminal conduct;

    (C)   to protect the public from further crimes of the defendant; and

    (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

  (3)   the kinds of sentences available;

  (4)   the kinds of sentence and the sentencing range

established for —

    (A)  the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5)  any pertinent policy statement . . . [issued by the Sentencing Commission];

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not.  See Crosby, 397 F.3d at 114-15.


**The Defendant**


The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Alberio's personal and family history.


**The Offense Conduct**


The following description draws from the PSR.  The

specific facts of the underlying conduct are adopted as set forth in that report. The information contained therein is based on an investigation conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

Between June 2010 and August 2010, Linares engaged in several telephone calls for the purpose of arranging the robbery of a cocaine courier who agreed to participate in a staged robbery of the cocaine he was transporting in exchange for a portion of the cocaine. Linares was not aware that an undercover agent ("UC") was posing as the cocaine courier. Some telephone calls were with Linares and the UC while other calls were with Linares and a confidential informant ("CI-1"). Most of the calls with Linares were consensually recorded and at times during the conversations they spoke in a coded language.

On June 11, 2010, CI-1 had a telephone conversation with Linares, who was in North Carolina, about the staged robbery. During this conversation, Linares agreed to partake in the robbery of between 15 and 20 kilograms of cocaine. Linares told CI-1 that he knew individuals who could help with the robbery. CI-1 told Linares that the narcotics might be hidden in traps inside furniture used to store narcotics. Linares

7

asked CI-1 if he (CI-1) could sell the narcotics in Bronx, NY, so that he (Linares) could take money instead of narcotics when he returned to his residence.   Linares made a reference to "bust[ing] something with his little brother like 2-3 weeks ago," which agents interpreted as Linares' commission of a similar crime.

On July 13, 2010, CI-1 had a telephone conversation with Linares and they discussed whether they would meet in New York or somewhere near Linares' residence in North Carolina to discuss the robbery.

On July 14, 2010, CI-1 had a telephone conversation with Linares and they discussed where they would meet to so that could discuss the robbery.   The CI-1 stated that he communicated with the UC who told CI-1 that the narcotics were being transported in an attempt to reduce the risk of them being stolen.   During the conversation, CI-1 told Linares, "If you can't do it [the robbery], just let me know.   I won't-I'm not gonna push it."   Linares responded, "I need it, do . . .   It's a done deal . . . ."

On July 28, 2010, the UC had a telephone conversation

8

with Linares to make arrangements to meet so that they could discuss the robbery and when the UC expected the arrival of the narcotics.    The UC did not want the robbers to be from his neighborhood.    Linares suggested recruiting his uncle and other individuals to assist him in stealing the narcotics.    The UC asked if Linares and his co-conspirators would "bring the heat," (firearms), and Linares responded, "if . . .  we gotta bring out own, you know, 'equipment' to work with, that's fine . . . ." which was believed to reference to firearms.    The UC stated that it might be difficult to obtain firearms in New York.

On August 5, 2010, the UC, CI-1, Linares, and a co-conspirator ("CC-1") met in a restaurant located in Charlotte, NC, to plan the robbery. Some of the conversations, which were in Spanish and English, included the following:

- During the meeting, the UC stated that he did not want to place more than 15 kilograms in his car because the trap in the car only held 15 kilos.    The CC-1 commented that there might be "more" narcotics than what was known to the UC. Linares agreed that there could be more narcotics in the apartment where the drugs were stored, and he suggested that  individuals  in  the  apartment  would  have  to  be

9

restrained and thoroughly checked.

- Linares made reference to a previous robbery that he committed which resulted in him being chased for 40 minutes, changing his license plate, and passing red lights.

- Linares, CC-1 and the UC discussed what they would do once they obtained the narcotics. Linares stated, "in this city, it goes for about $28,000," which agents interpreted as the price per kilogram of cocaine in Charlotte, NC. They also discussed how long it would take for Linares and his co-conspirators to travel to New York for which Linares stated that he could be available in 24 hours.

On September 23, 2010, the UC and the CI met with Linares, Alberio, Corrales, and Garrido at a restaurant located in Bronx, NY to plan the robbery. The UC noticed that Corrales was armed with a firearm and signaled to another undercover officer in the restaurant that Corrales possessed a firearm. The following was discussed during the meeting:

- Alberio told the UC that they engaged in a robbery in the past. Alberio indicated that he did not want to be in the location where the narcotics were located for several

minutes "cracking," which agents believe to refer to
hitting individuals who were in the room where the
narcotics were stored.    Alberio was concerned that the
narcotics customers were "geared up" (carrying firearms).
Garrido suggested that the UC contact them to tell them how
many individuals were in the apartment where the narcotics
were stored and provide a layout of the apartment.    The
defendants indicated that prior to the meeting with UC and
CI-1, they discussed how the robbery would be committed.

- The defendants also discussed how they planned to take the
  narcotics from the UC.    Alberio proposed two ways they
  would commit the robbery and requested that the UC indicate
  how they would take the narcotics from him.   As part of the
  robbery, Corrales volunteered to "hit" the UC and Garrido
  indicated the same.    Corrales remarked that when the UC
  open the door that he (Corrales) would "lay him down."
  Linares suggested that anyone inside the apartment should
  be restrained.

- Alberio suggested that he could obtain a "taser" and
  Linares asked if they could get a taser.   Alberio told the
  UC that they wanted to use their own cars because they had
  everything they needed in their car.   Garrido warned about
  "lookouts" being at the building where the narcotics were.

Linares asked the UC to provide a layout of the building.

- Alberio asked if the UC would be carrying a firearm and propose that they "disarm" the UC during the planned robbery. Alberio indicated that they were "carrying a lot of fuckin' heat."

- The defendants also discussed how they planned to divide the narcotics. The UC expected that there would be 15 "birds" (15 kilograms of cocaine). Alberio and Corrales proposed that the cocaine would be evenly divided amongst them.

Following the September 23, 2010, meeting, the defendants left the restaurant and were arrested. Upon Corrales' arrest, he was in possession of a Ruger .45 caliber located in the waistband of his pants. On the same date, after AFT agents completed an inventory search of a grey, Chevrolet Tahoe which had a North Carolina license plate used by the defendants, the following items were recovered from the vehicle:

- Three cell phones;

- Under the rear driver's side floorboard, a Smith & Wesson .40 caliber semiautomatic pistol, with a magazine loaded with 14 .40 caliber rounds, and a pair of brown work

gloves;

- Under the rear seat, in the middle part of the floorboard, a Ruger magazine loaded with seven .45 caliber rounds, which appeared to fit the firearm that Corrales possessed;
- Under the rear passenger side floorboard, a Smith & Wesson .357 revolver loaded with six .357 rounds;
- A pair of brown work gloves in the glove compartment.

According to the Government, the defendants are equally culpable for their involvement in the instant offense.

## The Relevant Statutory Provisions

For Count One, pursuant to 18 U.S.C. § 1951, the maximum term of imprisonment is 20 years.  Pursuant to 18 U.S.C. § 924(c)(1)(A)(i), Count Two carries a mandatory term of 60 months' imprisonment, which must be imposed to run consecutively to any other term of imprisonment that is imposed.

For Count One, if a sentence of imprisonment is imposed, the Court may impose a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2).  For

Count Two, if a sentence of imprisonment is imposed, the Court may impose a term of supervised release of not more than 5 years, pursuant to 18 U.S.C. § 3583(b)(1).  Multiple terms of supervised release are to run concurrently with each other, pursuant to 18 U.S.C. § 3624(e).

For Count One, the Defendant is not eligible for probation because he is being sentenced at the same time to a term of imprisonment on a different count or case, pursuant to 18 U.S.C. § 3561(a)(3).  For Count Two, the Defendant is not eligible for probation because the instant offense is a Class A felony, pursuant to 18 U.S.C. § 3561(a)(1).

For both Counts, the maximum fine that may be imposed is $250,000 per count, pursuant to 18 U.S.C. § 3571.  A special assessment of $100 per count is mandatory, pursuant to 18 U.S.C. § 3013.

Pursuant to 18 U.S.C. §§ 1963(a)(1), (a)(2), and (a)(3), Defendant shall forfeit to the United States all property, real and personal, involved in the offense or traceable to such property.

14

**The Guidelines**

The November 1, 2010 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a).   The Court finds the following with respect to Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

The Guideline for the violation of 18 U.S.C. § 1951 is found in § 2B3.1, which provides for a base offense level of 20, pursuant to § 2B3.1(a).

Because the object of the robbery was to take a controlled substance, a one-level increase in offense level is warranted, pursuant to § 2B3.1(b)(6).

Based on his plea allocution, Defendant has shown recognition of his responsibility for the offense.   Pursuant to § 3E1.1(a), the offense is reduced two levels.   Furthermore, an additional one-level reduction is warranted, pursuant to § 3E1.1(b), because Defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the

15

Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Accordingly, the applicable offense level is 18.

On July 9, 1989, Alberio was arrested and charged with Trespass After Warning.  On September 10, 1990, he was sentenced in the Eleventh Circuit Court in Miami, Florida to credit time served (12 days).  Pursuant to § 4A1.2(c)(1), this conviction warrants zero criminal history points.

On August 9, 1989, Alberio was arrested and charged with Burglary.  On October 6, 1989, in the Eleventh Circuit Court in Miami, Florida adjudication was withheld, and he was sentenced to two days' probation, credit for two days' jail. Pursuant to § 4A1.2(e)(3), this conviction warrants zero criminal history points.

On September 14, 1989, Alberio was arrested and charged with Larceny.  On October 6, 1989, in the Eleventh Circuit Court in Miami, Florida adjudication on the charge was withheld, and he was sentenced to probation.  Pursuant to § 4A1.2(e)(3), this conviction warrants zero criminal history

16

points.

On April 9, 1993, Alberio was arrested and charged with Armed Burglary and Aggravated Assault with a Weapon. On June 30, 1993, in the Eleventh Circuit Court in Miami, Florida he was sentenced to three years' state prison less 72 days credit time service, three years' probation, $250 restitution, and $255 court costs. Pursuant to § 4A1.2(e)(3), this conviction warrants zero criminal history points.

On January 5, 1998, Alberio was arrested and charged with Loitering. On January 5, 1998, in Dade County Court in Miami, Florida he was sentenced to time served. Pursuant to § 4A1.2(c)(2), this conviction warrants zero criminal history points.

On May 28, 2000, Alberio was arrested and charged with a Nonmoving Traffic Violation as well as Unlawful Driving as a Habitual Traffic Offender. On June 19, 2000, in the Eleventh Circuit Court in Miami, Florida he was sentenced to two years' probation per count and to abide by court restrictions. On September 18, 2000, for a violation of this probation, he was sentenced to five months' and six days' county jail time and two

17

years' probation.    Pursuant  to  § 4A1.2(c)(1)  and  § 4A1.1(b),
this conviction warrants two criminal history points.

On  June  28,  2001,  Alberio  was  arrested  and  charged
with Unlawful Driving as a Habitual Traffic Offender.  On August
2, 2001,  in the Eleventh Circuit Court in Miami, Florida he was
sentenced  to  two  years'  probation.    Pursuant  to  § 4A1.2(c)(1)
and  § 4A1.1(c),  this  conviction  warrants  one  criminal  history
point.

On October 11, 2002, Alberio was  arrested  and  charged
with a Passing a Forged Vehicle Identification.  On October 11,
2002,  in  the  Eleventh  Circuit  Court  in  Miami,  Florida he  was
sentenced  to  two  years'  probation.    Pursuant  to  § 4A1.2(c)(1),
this conviction warrants one criminal history point.

On August 12, 2004, Alberio was  arrested  and  charged
with  Unlawful  Driving  as  a  Habitual  Traffic  Offender.    On
September  2,  2004,  in  the  Eleventh  Circuit  Court  in  Miami,
Florida he was sentenced to one year probation.

On December 7, 2004, Alberio was  arrested  and  charged
with  Unlawful  Driving  as  a  Habitual  Traffic  Offender.    On

18

January 18, 2005, for a violation of his probation for the August 12, 2004 offense, his probation was revoked and he was sentenced to 120 days' in jail.   For the December 7, 2004 offense, Alberio was sentenced to 120 days' in jail to run concurrently.   Pursuant to § 4A1.2(a)(2), § 4A1.2(e)(2), and § 4A1.1(b) each sentence warrants two criminal history points.

The criminal convictions above result in a criminal history score of eight.   A total of eight criminal history points establishes a Criminal History Category of IV, pursuant to the table at Chapter 5, Part A, of the Guidelines.

Based on a total offense level of 18 and a Criminal History Category of IV, the Guidelines range for imprisonment is 41 to 51 months.   In addition, a violation of 18 U.S.C. § 924(c)(1)(A)(i) requires a mandatory term of 60 months' imprisonment, which must be imposed to run consecutively to any other term imposed.

The Guidelines range for a term of supervised release is at least three years but not more than five years, pursuant to § 5D1.2(a)(1).

Defendant is not eligible for probation because the instant offense is a Class A felony, pursuant to § 5B1.1(b)(1).

The fine range for the instant offenses is $6,000 to $60,000, pursuant to § 5E1.2(c)(3)(A) and (c)(3)(B). Subject to Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,270.93 to be used for imprisonment, a monthly cost of $317.32 for supervision, and a monthly cost of $2,063.19 for community confinement.

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but

not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a downward departure from the Guidelines sentence is warranted in the instant case.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the nature and circumstances of the offense." According to ATF agents, the investigation into the instant offenses began in June 2009 and included a meeting in North Carolina in August 2010 as well as extensive recordings of telephone conversations. Alberio was not a participant in the phone calls planning the offenses that are reported in the PSR, nor did he participate in the meeting in North Carolina. From the PSR it appears that the Defendant became involved in the instant offenses just prior to his arrest and was a participant in the September 2010 meeting.

Under 18 U.S.C. § 3553(a)(6), the Court further considers "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

21

The Court notes that, in this case, Alberio has accepted responsibility for his conduct. In light of the nature and circumstances of the offense as well as the need to avoid unwarranted sentence disparities among the defendants, the Court finds that a downward departure from the Guideline sentence is appropriate to impose a sentence "sufficient, but not greater than necessary" under 18 U.S.C. § 3553(a).

**The Sentence**

For the instant offenses, Alberio will be sentenced to 80 months' imprisonment and 3 years' supervised release.

Alberio is directed to report to the nearest United States Probation Office within seventy-two hours of release from custody to commence his term of supervised release. It is recommended that Alberio be supervised by the district of his residence.

As mandatory conditions of his supervised release, Alberio shall: (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; (4) refrain from any

22

unlawful use of a controlled substance; (5) submit to one drug test within fifteen (15) days of placement on probation or supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer; and (6) cooperate in the collection of DNA as directed by the probation officer.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that Defendant is able to pay a fine, and so the fine in this case shall be waived. A special assessment of $200, payable to the United States, is mandatory and shall be due immediately.

Defendant shall forfeit to the United States all property, real and personal, involved in the offense, traceable to such property, or representing any proceeds he obtained directly or indirectly from the offense.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for May 31, 2011.

23

It is so ordered.

New York, NY
May  $\tilde{3}$ /  , 2011

ROBERT W. SWEET
U.S.D.J.

24